IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

FILED IN OPEN COURT
DEC - 4 2012
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| v. | ) CRIMINAL NO. 3:12CR131 |
| JOSE ARMANDO BRAN,<br>a.k.a. "Pantro,"<br>(Counts 1-5) | ) |
| Defendant | ) |

**SECOND SUPERSEDING INDICTMENT**

December 2012 Term – at Richmond, Virginia.

THE GRAND JURY CHARGES THAT:

*GOVT PROPOSED REDACTION*

## Introduction

At all times relevant to this Indictment:

1. The defendants, JOSE ARMANDO BRAN, also known as "Pantro," were members and associates of a criminal organization, specifically, MS-13, also known as La Mara Salvatrucha. MS-13 was a violent gang involved in a variety of criminal activities including witness intimidation, aggravated assault, and murder, in the Eastern District of Virginia and elsewhere.

2. MS-13 operated in the Eastern District of Virginia, starting no later than approximately 2010. MS-13 members and associates were located throughout the United States in, among other places, Virginia, Maryland, and New York. MS-13 also has members internationally, primarily located in El Salvador, Guatemala, Honduras, and Mexico.

3. MS-13 recruited predominantly from the Hispanic community and typically among juveniles. Recruits were "jumped in" to the gang by being physically beaten by members while a member counted to 13.

4. MS-13 gang members typically tattooed their bodies to identify their membership in, and allegiance to, MS-13, although some members deliberately omitted such tattoos in an effort to avoid detection by law enforcement. MS-13 gang tattoos typically included large block "M" and "S" letters, the number "13," the member's clique name, and the MS-13 hand sign which represented both an inverted "M" and the face of the devil with outstretched fingers representing the devil's horns.

5. MS-13 recruits were indoctrinated into MS-13 rules, which were ruthlessly enforced. One prominent rule encouraged MS-13 gang members to confront, fight, and kill rival

gang members, known as "chavalas." Unreasonable refusal to confront and fight "chavalas" was punishable by beatings, and, potentially, death.

6. Another prominent MS-13 rule commanded silence about gang activity and prohibited cooperation with law enforcement. The sanction for violating the code of silence was a "green light." A "green light" was a signal that the gang leadership had approved the killing of someone. The killing of those who cooperated with the government and provided information to law enforcement served as a clear warning to others who might consider informing on MS-13.

7. MS-13 required its members to support its leadership and their decisions about gang activities, including how and where dues collected from the membership should be spent. Leadership for MS-13 was based primarily in El Salvador.

8. MS-13 was made up of local organizations or "cliques" that held regular individual meetings and sent leaders to larger regional or general meetings to maintain control of, and resolve problems within the gang. Each clique was run by the "First Word," who was the leader or president of the local organization. The "Second Word" was the second in command or vice president of the clique. Soldiers were general members who took orders from the "First Word" or "Second Word."

9. MS-13 members in the United States routinely sent United States currency to MS-13 leadership in El Salvador in an effort to continue the business of the enterprise.

### The Racketeering Enterprise

10. MS-13, including its leadership, membership, and associates, constituted an enterprise as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and

foreign commerce. MS-13 is an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

### Objectives of the Enterprise

11. The objectives of MS-13 included the following:

(a) Preserving, expanding, and protecting the power, territory, and prestige of MS-13 through the use of intimidation, violence, and threats of violence;

(b) Promoting and enhancing MS-13's and its members' and associates' activities;

(c) Keeping victims in fear of MS-13 and in fear of its members and associates through intimidation, threats of violence, and violence;

(d) Confronting and retaliating against rival gangs through the use of intimidation, violence, threats of violence, assaults, and murders;

(e) Hindering and obstructing the efforts of law enforcement to identify, apprehend, and successfully prosecute and punish gang members; and

(f) Financially supporting members of MS-13, including those who had been deported and those who had been incarcerated in the United States and El Salvador.

### Means and Methods of the Enterprise

12. Among the means and methods by which the defendants and their associates conducted and participated in the conduct of the affairs of MS-13 were the following:

(a) Members of MS-13 and their associates used intimidation, threats of violence, and violence, including murder and assault, to preserve, protect, and expand the enterprise's territory and activities;

(b) Members of MS-13 and their associates used intimidation, threats of violence, and violence, including murder and assault, to promote and enhance its prestige, reputation, and position in the community;

(c) Members of MS-13 and their associates promoted a climate of fear through intimidation, violence, and threats of violence;

(d) Members of MS-13 and their associates used intimidation, threats of violence, and violence, including murder and assault, against various individuals, including known and suspected members of rival gangs;

(e) Members of MS-13 used intimidation, threats of violence, and violence, including murder and assault, to discipline members and associates who had violated enterprise rules;

(f) Members of MS-13 used intimidation, threats of violence, and violence, including murder and assault, to punish enterprise members and associates who had been disloyal;

(g) Members of MS-13 traveled throughout the United States, Mexico, and Central America to attend and promote enterprise activities;

(h) Members of MS-13 used telephones to discuss gang-related business and to obtain approval for the use of violence in furtherance of the purposes of MS-13;

(i) Members of MS-13 collected dues to send to fellow gang members who were incarcerated, who had been deported to Central America and elsewhere, or who were in need of money. MS-13 members in the United States sent United States currency to MS-13 leadership in El Salvador in an effort to continue the business of the enterprise;

13. MS-13, through its members and associates, engaged in racketeering activity as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), including acts

involving murder, in violation of the laws of the Commonwealth of Virginia, and involving acts indictable under Title 18, United States Code, Section 1512 (witness tampering).

## COUNT ONE

(Conspiracy to Commit Murder in Aid of Racketeering)

14. On or about July 24, 2011, the exact dates being unknown, in the Eastern District of Virginia and elsewhere within the jurisdiction of this court, for the purpose of gaining entrance to and maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, the defendants, JOSE ARMANDO BRAN, also known as "Pantro,"

together with others known and unknown to the grand jury, unlawfully, knowingly, and intentionally did combine, conspire, confederate, and agree together and with each other and others to murder Osbin Noel Hernandez-Gonzalez, in violation of the laws of the Commonwealth of Virginia, specifically, Va. Code Ann. §§ 18.2-22 and 18.2-32.

### Manner and Means of the Conspiracy

15. The means and methods by which the defendants, JOSE ARMANDO BRAN,

and their co-conspirators achieved the purpose of the conspiracy and conducted and participated in the affairs of the conspiracy, included but were not limited to, the following:

(a) It was a part of the conspiracy that at sometime prior to July 23, 2011, the Sailor set was established as an MS-13 clique operating in and around Richmond, Virginia.

(b) It was further a part of the conspiracy that defendant JOSE ARMANDO BRAN was the leader (a.k.a. "First Word") of the MS-13 Sailors Set in and around Richmond, Virginia.

(c)

(d)

(e)     It was further a part of the conspiracy that the co-conspirators identified Osbin Noel Hernandez-Gonzalez as a potential victim, selected a team to commit the murder, developed and carried out a scheme to lure the victim to the vicinity of co-conspirators, provided a firearm, murdered Osbin Noel Hernandez-Gonzalez by shooting him at close range, disposed of a firearm, and reported on the success of the conspiracy.

(f)     It was further a part of the conspiracy that the defendants, JOSE ARMANDO BRAN,                                              , would and did play different roles in the conspiracy, taking upon themselves different tasks and participating in the affairs of the conspiracy through various acts. Some of the roles which the defendants assumed and carried out included, among others: planner, supervisor, manager, and facilitator.

### Overt Acts: Homicide of Osbin Noel Hernandez-Gonzalez

16.     In furtherance of the conspiracy, and in order to effect the objects of the conspiracy, the defendants committed the following overt acts within the Eastern District of Virginia:

(a)     On or about July 23, 2011, defendants BRAN,                    and other co-conspirators known and unknown to the grand jury suspected that Osbin Noel Hernandez-Gonzalez was cooperating with a rival gang to the MS-13 Sailors Set. BRAN,                 and others believed that Hernandez-Gonzalez was a member of this rival gang.

(b) On or about July 23, 2011, defendants BRAN and other co-conspirators, known and unknown to the grand jury, agreed that the murder of Osbin Noel Hernandez-Gonzalez would be carried out as a gang initiation for two juveniles, "J.S.," a.k.a. "Sneaky," a.k.a. "Jeremy," and "L.C.," a.k.a. "Destroyer."

(c) On or about July 23, 2011, defendant BRAN, accompanied by other MS-13 members, confronted Hernandez-Gonzalez about his gang membership in the backyard of the residence of an MS-13 member in Richmond, Virginia.

(d) On or about July 23, 2011, after Hernandez-Gonzalez had run away and while still at the residence, BRAN handed KAREN SAN JOSE a cellular telephone and directed SAN JOSE to call Hernandez-Gonzalez and persuade him to return to the residence.

(e) On or about July 23, 2011, defendant BRAN selected J.S. and L.C. to murder Hernandez-Gonzalez as part of their gang initiation.

(f) On or about July 23, 2011, defendant BRAN made this selection in front of KAREN SAN JOSE.

(g) On or about July 23, 2011, SAN JOSE called Hernandez-Gonzalez to lure him back to the residence.

(h) On or about July 23, 2011, SAN JOSE called Hernandez-Gonzalez a second time to urge him to return.

(i) On or about July 23 to July 24, 2011, SAN JOSE, J.S., L.C. and Hernandez-Gonzalez got into a vehicle and drove to the area of the Pony Pasture, a park located along the James River in Richmond, Virginia.

(j) On or about July 24, 2011, MICHAEL AREVALO and Yerwin

Ordonez, a.k.a. "Probador," left the residence together in Ordonez's work van.

(k) On or about July 24, 2011, MICHAEL AREVALO and Yerwin Ordonez drove to the Pony Pasture, where they met Hernandez-Gonzalez, SAN JOSE, J.S., and L.C.

(l) On or about July 24, 2011, MICHAEL AREVALO's role was to ensure that J.S. and L.C. completed the homicide of Hernandez-Gonzalez.

(m) On or about July 24, 2011, J.S. and L.C. shot and killed Hernandez-Gonzalez.

(n) On or about July 24, 2011, MICHAEL AREVALO provided at least one of the firearms used to murder Hernandez-Gonzalez.

(o) On or about July 24, 2011, Ordonez directed J.S. and L.C. to go back and retrieve Hernandez-Gonzalez's cellular telephone.

(p) On or about July 24, 2011, AREVALO, SAN JOSE, Ordonez, J.S., and L.C. arrived at Latinos Unidos, where news of the murder was reported to BRAN.

(q) On or about July 24, 2011, J.S. and L.C. were jumped into the MS-13 Sailors set.

(In violation of Title 18, United States Code, Section 1959(a)(5))

## COUNT TWO

(Murder in Aid of Racketeering Activity)

17. Paragraphs 1 through 13 of Count One of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

18. On or about July 24, 2011, in Richmond, Virginia, within the Eastern District of Virginia and elsewhere, for the purpose of gaining entrance to and maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, the defendants, JOSE ARMANDO BRAN,                                , together with others known and unknown to the grand jury, unlawfully, knowingly, and intentionally murdered Osbin Noel Hernandez-Gonzalez in violation of the laws of the Commonwealth of Virginia, specifically, Va. Code Ann. 18.2-32 and 18.2-18, and did aid, abet, counsel, command, induce, and cause another to commit said offense. (In violation of Title 18, United States Codes, Sections 1959(a)(1) and 2.)

## COUNT THREE

(Use of a Firearm During a Crime of Violence Causing Death To Another)

19. On or about July 24, 2011, in Richmond, Virginia, within the Eastern District of Virginia and elsewhere, the defendants, JOSE ARMANDO BRAN,                     , and                     and others, known and unknown, did unlawfully, knowingly, and intentionally use, carry, and discharge a firearm during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, specifically, murder in aid of racketeering activity, in violation of Title 18, United States Code, Section 1959(a)(1), as set forth and charged in Count Two of this Superseding Indictment, which is re-alleged and incorporated by reference herein, and in the course of this violation caused the death of Osbin Noel Gonzalez-Hernandez through the use of the firearm which killing was murder, as defined in 18 U.S.C. § 1111, in that the defendants, JOSE ARMANDO BRAN,                     , with malice aforethought, did unlawfully kill and murder Osbin Noel Gonzalez-Hernandez by shooting him with a firearm and did aid, abet, counsel, command, induce, and cause another to commit said offense.

(In violation of Title 18, United States Code, Sections 924(c)(1)(A) and (j), and 2.)

## COUNT FOUR

(Conspiracy to Commit Murder in Aid of Racketeering)

20. Paragraphs 1 through 13 of Count One of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

21. From on or about January 14, 2012, the exact dates being unknown, in the Eastern District of Virginia and elsewhere within the jurisdiction of this court, for the purpose of gaining entrance to and maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, the defendant, JOSE ARMANDO BRAN, together with others known and unknown to the grand jury, unlawfully, knowingly, and intentionally did combine, conspire, confederate, and agree together and with each other and others to murder victim F.A., in violation of the laws of the Commonwealth of Virginia, specifically, Va. Code Ann. §§ 18.2-22 and 18.2-32.

### Manner and Means of the Conspiracy

22. The means and methods by which the defendant, JOSE ARMANDO BRAN, and his co-conspirators achieved the purpose of the conspiracy and conducted and participated in the affairs of the conspiracy, included but were not limited to, the following:

(a) It was a part of the conspiracy that at sometime prior to July 23, 2011, the Sailor set was established as an MS-13 clique operating in and around Richmond, Virginia.

(b) It was further a part of the conspiracy that defendant, JOSE ARMANDO BRAN, was the "First Word" and leader of the MS-13 Sailors Set in and around Richmond, Virginia.

(c) It was further a part of the conspiracy that the defendant, JOSE ARMANDO BRAN, and the co-conspirators identified victim F.A. as a potential homicide victim, selected a team to commit the murder, and assigned roles within the team.

(d) It was further a part of the conspiracy that co-conspirators drove F.A. to the scene of the assault, stabbed the victim F.A. multiple times, and reported to the defendant, JOSE ARMANDO BRAN, on what the team believed was the success of the conspiracy.

(e) It was further a part of the conspiracy that the defendant, JOSE ARMANDO BRAN, would and did play different roles in the conspiracy, taking upon himself different tasks and participating in the affairs of the conspiracy through various acts. Some of the roles which the defendant assumed and carried out included, among others: planner, supervisor, manager, and facilitator.

### Overt Acts: Attempted Homicide of F.A.

23. In furtherance of the conspiracy, and in order to effect the objects of the conspiracy, the defendants committed the following overt acts within the Eastern District of Virginia:

(a) In or around January 2012, BRAN and others suspected that F.A. was forwarding information about the MS-13 Sailors Set to another gang. BRAN and others also believed that F.A. was a member of this rival gang.

(b) On or about January 14, 2012, defendant BRAN met with members of the Richmond MS-13 Sailors Set in a trailer in the vicinity of Jefferson Davis Highway in Richmond, Virginia, within the Eastern District of Virginia.

(c) On or about January 14, 2012, defendant BRAN directed that F.A. would be killed by members of the Richmond MS-13 Sailors Set. BRAN directed that four individuals make up the team that was to kill F.A.

(d) On or about January 14, 2012, after having given orders that F.A. would be killed, BRAN left the vicinity of the trailer.

(e) On or about January 14, 2012, four MS-13 members and associates left the trailer with F.A. and drove to a nightclub in Richmond, Virginia, telling F.A. that they were all going to go dancing.

(f) On or about January 14, 2012, after spending some time at the nightclub, the four MS-13 members drove F.A. to the vicinity of 3821 Terminal Avenue in Richmond, Virginia. The MS-13 members told F.A. that they were going to commit a burglary in that area.

(g) On or about January 14, 2012, one MS-13 member grabbed F.A., pulled the hood of F.A.'s sweatshirt over F.A.'s head, and held him.

(h) On or about January 14, 2012, a second MS-13 member stabbed F.A. in the head, back, and neck approximately fifteen times. F.A. lost a portion of one lung as a result of the attack.

(i) On or about January 14, 2012, after F.A. escaped and ran to a nearby residence, the MS-13 members left the scene, believing that F.A. had been mortally wounded.

(All in violation of Title 18, United States Code, Section 1959(a)(5))

## COUNT FIVE

(Maiming in Aid of Racketeering)

24. Paragraphs 1 through 13 of Count One of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

25. On or about January 14, 2012, in Richmond, Virginia, in the Eastern District of Virginia and elsewhere, for the purpose of gaining entrance to and maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, JOSE ARMANDO BRAN, also known as "Pantro," the defendant, unlawfully and knowingly did maim victim F.A., in violation of the laws of the Commonwealth of Virginia, specifically, Va. Code Ann. 18.2-51.2 and 18.2-18, and did aid, abet, counsel, command, induce, and cause another to commit said offense.

(In violation of Title 18, United States Codes, Sections 1959(a)(2) and 2.)

### Notice of Special Findings

26.  The allegations of Counts Two and Three of this Second Superseding Indictment are hereby re-alleged as if fully set forth herein and incorporated by reference.

27.  As to Count Two, the defendants, JOSE ARMANDO BRAN,

(a)  were more than eighteen (18) years of age at the time of the offense;

(b)  intentionally killed Osbin Noel Hernandez-Gonzalez

(c)  intentionally inflicted serious bodily injury that resulted in the death of Osbin Noel Hernandez-Gonzalez

(d)  intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and that Osbin Noel Hernandez-Gonzalez died as a direct result of such act.

(e)  intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life, and Osbin Noel Hernandez-Gonzalez died as a direct result of the act.

and

(f)  committed the offense after substantial planning and premeditation to cause the death of Osbin Noel Hernandez-Gonzalez

A TRUE BILL:

Pursuant to the E-Government Act, the original of this page has been filed under seal in the Clerk's Office

NEIL H. MACBRIDE
UNITED STATES ATTORNEY

By: /s/ Roderick C. Young
Roderick C. Young
Assistant United States Attorney

/s/ Andrew Creighton
Andrew Creighton
Trial Attorney
Department of Justice, Criminal Division