

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

UNITED STATES OF AMERICA

v.                                                    Criminal No. 3:12cr131-01

JOSE ARMANDO BRAN,

Defendant.

## MEMORANDUM OPINION

For the reasons set forth in this Memorandum Opinion and on the record on May 7, 2013, Jose Armando Bran's ("Bran") MOTION IN LIMINE TO DISMISS THE SECOND SUPERCEDING [sic] INDICTMENT (Docket No. 213 (sealed), 271 (redacted))[1] was granted in part and denied in part by the Order dated May 8, 2013 (Docket No. 245).

## INTRODUCTION

On December 4, 2012, Bran was charged in a Second Superseding Indictment with Conspiracy to Commit Murder in Aid of Racketeering, in violation of 18 U.S.C. § 1959(a)(5), Murder in Aid of Racketeering, in violation of 18 U.S.C. §§ 1959(a)(1) and 2, Use of a Firearm During a Crime of Violence Causing Death to Another, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2, Conspiracy to Commit Murder in Aid of Racketeering, 18 U.S.C. §

---

[1] All future references to the filings on this matter will be to the redacted versions filed pursuant to the Court's Order of May 9, 2013 (Docket No. 247).

1959(a)(5), and Maiming in Aid of Racketeering Activity, in violation of 18 U.S.C. §§ 1959(a)(2) and 2. At their core, all of the charges proceed on the theory that Bran was the leader of the so-called Richmond Sailors Set of the gang La Mara Salvatrucha, commonly referred to as MS-13; that, in that capacity, Bran ordered the killing of two people, Osbin Hernandez-Gonzalez and Florentino Ayala. The defense theory was that Bran was not the leader of the Sailors Set; that only the leader can order a murder (or give a "green light"), and then only after consultation with MS-13 leadership in El Salvador, and that, therefore, Bran did not order the murders and those witnesses who say that Bran ordered the murders were lying.

On January 31, 2013, the Court entered an agreed upon discovery order which required, inter alia, that the United States produce all Jencks Act and Giglio materials to the defense not later than April 26, 2013; that the United States would include any Brady material contained in Jencks Act material at that time, and that the United States would, generally, comply with its obligations as required by Brady v. Maryland, 373 U.S. 83 (1963) and United States v. Agurs, 427 U.S. 97 (1976). See Order dated January 31, 2013 (Docket No. 83) at 4-5.

On April 30, 2013, sixty days after the United States delivered the Jencks materials, Bran filed his Motion in limine

2

and Memorandum in Support thereof alleging "apparent violations of Brady v. Maryland." Bran therein advised that he had received from Assistant Commonwealth's Attorney for the City of Richmond Anne Cabell Baskervill ("Baskervill") a document identified in the memorandum as an "FBI 302," which purported to reflect the information obtained during a February 21, 2012 interview of Jose "Biggie" Alvarenga ("Alvarenga") at the Winchester Regional Jail in Winchester, Virginia.[2] On April 24, 2013, as part of the Jencks Act disclosure, the United States produced to the defense the official "302" of that interview. The crux of the defendant's motion, at the time of filing, was that there were several "substantial differences" between the two documents which, taken as a whole, indicated that the FBI had edited its memorialization of the interview in order to "divert[] Mr. Bran away from a potential witness who would point out a significant inconsistency in the Government's case." Def. Mem. at 3.

---

[2] An "FBI 302" refers to Form FD-302, which is a typewritten form used by the Federal Bureau of Investigation to memorialize interviews. During an interview, while one agent asks questions, a second (typically the junior) agent takes notes and then uses those notes to prepare the "302." The document provided by Ms. Baskervill to defense counsel was not, strictly speaking, a "302" insofar as it was not produced on Form FD-302. Rather, the document appears to be the typewritten narrative recitation of the contents of the interview that would subsequently be entered into Form FD-302. The document provided by Ms. Baskervill did not contain the "Federal Bureau of Investigation" header, page numbers, or the identification of the FBI investigators that is present on a completed "302."

In essence, Bran claimed that the FBI agents had altered the contents of the "302" in two significant ways. First, that the Baskervill version of the "302" indicated that approval for a "green-light" must come from MS-13 leadership in El Salvador, but that the Jencks version omitted that language. Id. at 2. According to the defense, "Mr. Bran's phone records were produced by the Government and they do not reflect any phone calls made to El Salvador on the night of the murder." Id. Thus, argued Bran, the FBI had manipulated the narrative in order to deemphasize the role that El Salvadoran leadership would have played in the death of Osbin Hernandez-Gonzalez (and, by extension, would have aided Bran's defense by allowing him to argue that the lack of communication with El Salvador indicated that he had not participated in the authorization of the murder of Hernandez-Gonzalez).

The second alteration relating to information provided by Alvarenga concerned Mario Gonzalez-Ticas ("Ticas"), who was known as "Zatan." At the end of the interview, Alvarenga agreed to review photographs and provide some information about certain individuals, one of whom was Ticas. In the Baskervill version of the "302", Alvarenga is recorded as having identified Ticas as the leader of the Richmond Sailors Set following the deportation of the previous leader, "Spider." In that version of the narrative, Alvarenga also explains that Ticas is still a member

4

of MS-13; that Ticas had been deported and returned to the United States all the while remaining an MS-13 member; and that Ticas had never attempted to leave MS-13. In the Jencks Act version of the "302", Alvarenga is merely reported to have said as to Ticas: "I know you know who this is."

Bran's motion sought relief under various theories including a Brady violation, a violation of Model Rule of Professional Conduct 3.8(d), and a violation of Department of Justice office protocol as set forth in the so-called "Ogden Memo." Under all theories, however, Bran argued, in essence, that the FBI agents had altered the "302" between the version provided to the Richmond Commonwealth's Attorney's Office and the version provided to Bran's counsel in order to obfuscate information that would cast doubt on the government's theory of the case and to distract defense counsel away from material witnesses who might be able to provide evidence of actual innocence or who might be able to discredit the government's evidence.

After the initial motion was filed, the United States provided the defense with additional disclosures relating to the investigation, and subsequent deportation, of Ticas. Included in the new material was information that, in late-September 2011, the Department of Homeland Security Immigration and Customs Enforcement had received information that, an individual, later

5

identified as Ticas, had ordered the murder of a rival gang member in Chesterfield, Virginia. Special Agent Rosenberg of Homeland Security Investigations investigated that report and made contact with Ticas. At that time, Ticas was being held, pending deportation, at the Farmville Detention Center following an arrest in Roanoke, Virginia for being drunk in public. Rosenberg was able to determine that Ticas had come to the attention of the officials at the detention center following an incident where Ticas was found to be writing gang symbols on his clothing. Rosenberg obtained visitor logs and phone records for Ticas, which revealed visits to Ticas from Bran and from another known MS-13 member, Giovanni Torres. Rosenberg also determined that, beginning on July 20, 2011, Ticas made a number of phone calls from the detention facility to unknown individuals, including two phone calls to the same number on the day of Hernandez-Gonzalez' murder and seven more calls to that number over the next three days.

During Rosenberg's investigation, Ticas was moved from Farmville to the Hampton Roads Regional Jail because of his involvement in MS-13. Rosenberg reported all of this information to the FBI and to the United States Attorney's Office. On November 1, 2011, agents with the FBI and ICE interviewed Ticas who denied any involvement in MS-13. At the hearing on this

6

motion, Agent Rosenberg testified that he did not believe Ticas's statements that he was no longer involved in MS-13.

In addition, in April 2012, a cooperating MS-13 member told Agent Rosenberg that the cooperating gang member had been told by a member of the Richmond Sailors that, at a party on Walmsley Boulevard, approximately a year earlier, Ticas had ordered the murder of Osbin Hernandez-Gonzalez and that Ticas had placed Michael "Reptile" Arevalo in charge of the team sent to commit the murder. In October 2012, counsel for Bran was informed of this information. As a result, defense counsel sent their investigator to the Hampton Roads Regional Jail to interview Ticas. The investigator was denied access and was informed that he would not be able to see Ticas because the Federal Public Defender did not represent Ticas in his immigration proceeding. When counsel for Bran raised this issue with ICE, the ICE agents suggested that defense counsel send a letter to Ticas asking that the defense investigator be added to his approved visitor list. That letter was sent on November 23, 2012. At the same time, defense counsel were informed by ICE that, under ICE procedures, counsel would be allowed to interview Ticas only if ICE agents were present. Ticas did not respond to the letter, and defense counsel concluded that an interview with ICE agents present would be futile. Ticas was deported to El Salvador in early 2013.

In his reply brief (Docket No. 282), Bran argued, in light of the newly disclosed information, that, if the United States had not deported Ticas, he would have been available as a witness to testify that Bran did not order the killing of Osbin Herndanez-Gonzalez. Bran asked the Court to either dismiss the indictment or issue a missing witness instruction. The United States filed a sur-reply (Docket No. 285) and argument was held on May 7, 2013.

## DISCUSSION

In Brady v. Maryland, 373 U.S. 83, 87 (1963), the Supreme Court of the United States recognized that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." To establish a Brady violation, a defendant must show: (1) "[t]he evidence at issue [is] favorable to the accused, either because it is exculpatory, or because it is impeaching;" (2) "that evidence [was] suppressed by the State, either willfully or inadvertently;" and (3) "prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). Bran's Brady claim fails for two reasons.

First, the revisions that were made after the Baskervill version of the "302" were simply a part of the usual editing and vetting process that takes place in the FBI's attempt to assure

accuracy. In particular, under FBI procedure, the first draft of a "302" is prepared by the agent who took notes and is then reviewed by any other agent(s) who were present for the interview. It was this process that yielded the difference between the Baskervill version, which was a draft, and the final version. There is no evidence that the purpose of the editorial changes was to divert attention to Bran or to distract his counsel. Nor do the textual changes actually have those effects.

Second, assuming arguendo that the revisions made between the Baskervill version of the "302" and the "Jencks Act 302" constitute material evidence that has been suppressed, Bran is simply unable to demonstrate prejudice from the inconsistencies between the two drafts. Indeed, to the extent that Bran argues that the "Baskervill 302" contains evidence that is favorable to his defense, defense counsel was in possession of that version of the "302" months in advance of their receipt of the Jencks Act material. Courts have consistently found no Brady violation where "the disclosure of evidence [was] available to the defendant from other sources, including diligent investigation by the defense." Fullwood v. Lee, 290 F.3d 663, 686 (4th Cir. 2002); see also United States v. Higgs, 663 F.3d 726, 735 (4th Cir. 2011) ("There is no Brady violation if the evidence is available to the defense from other sources or the defense already possesses the evidence."); United States v. Roane, 378

9

F.3d 382, 402 (4th Cir. 2004) ("We have explained that information actually known by the defendant falls outside the ambit of the Brady rule."); United States v. Wilson, 901 F.2d 378, 381 (4th Cir. 1990) ("[W]here the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the Brady doctrine."). Insofar as Bran had both "302s" well in advance of trial, and, in fact, possessed the "302" that he viewed as most favorable to his defense months before he was entitled to the interview reports at all, Bran simply cannot make out a prima facie Brady violation as to the contended alterations in the "302s."

The decision of the United States to deport Ticas poses a different question. And, indeed, between the filing of the initial defense motion and the argument, the focus of the defense motion shifted from the "302s" to the deportation of a purportedly material defense witness.[3]

Courts have consistently recognized that "whether grounded in the Sixth Amendment's guarantee of compulsory process or in

---

[3] At argument, the United States moved for a continuance of the hearing and of the trial to permit it to fully brief the issue of the deportation of an allegedly material witness. That request was denied. Of course, it was the United States that first raised the issue of deportation in the context of a duty to preserve evidence. See Govt. Opp. at 9 (citing United States v. Valenzuela-Bernal, 458 U.S. 585 (1982) and United States v. Chaparro-Alcantara, 226 F.3d 616 (7th Cir. 2000) for the "rule" on "deportation of witnesses").

10

the more general Fifth Amendment guarantee of due process, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." United States v. Stever, 603 F.3d 747, 755 (9th Cir. 2010). The Supreme Court of the United States has recognized that the deportation of a material witness might implicate a defendant's Sixth Amendment right to compulsory process or the Fifth Amendment right to due process. United States v. Valenzuela-Bernal, 458 U.S. 858 (1982). However, the Supreme Court made clear that, in light of the government's additional obligation to enforce the immigration laws, there is no constitutional problem where the person is deported after the government has "concluded that [the witnesses] possessed no evidence relevant to the prosecution or the defense of respondent's criminal charge." Id. at 866.

The Court emphasized that the executive branch's responsibility to enforce immigration policy:

> [J]ustifies the prompt deportation of illegal-alien witnesses upon the Executive's good faith determination that they possess no evidence favorable to the defendant in a criminal prosecution. The mere fact that the Government deports such witnesses is not sufficient to establish a violation of the Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fifth Amendment.

Id. at 872-73. In addition, "sanctions may be imposed on the Government for deporting witnesses only if the criminal

defendant makes a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense." Id. at 873. In so holding, the Court also recognized that deportation of the witness "deprives the defendant of an opportunity to interview the witnesses to determine precisely what favorable evidence they possess." Id. As a result, a defendant would need to make the showing either by argument from "agreed facts" or by advancing "additional facts . . . with a view to persuading the court that the testimony of a deported witness would have been material and favorable to his defense." Id.

Since Valenzuela-Bernal, the exact nature of the test has remained somewhat unsettled. In the Seventh, Ninth, and Tenth Circuits, there are two facets of the test: "First, the defendant must show that the government acted in bad faith . . . Second, the defendant must demonstrate that deportation of the witness prejudiced his case." United States v. Leal-Del Carmen, 697 F.3d 964, 969-70 (9th Cir. 2012); see also United States v. Chaparro-Alcantara, 226 F.3d 616, 624 (7th Cir. 2000); United States v. Iribe-Perez, 129 F.3d 1167, 1173 (10th Cir. 1997). The Fifth Circuit has explicitly left open whether it recognizes the "bad faith" facet, although it is required for a showing of "plain error" by the district court. United States v. Gonzales, 436 F.3d 560, 579 (5th Cir. 2006) ("Whether this court ever

adopts the second prong, requiring a showing of bad faith by government officials, remains an open question that we do not decide today."). Further, in the Seventh Circuit, the defendant must show "official animus" or "a conscious effort to suppress exculpatory evidence." Chaparro-Alcantara, 226 F.3d at 624. In the Ninth Circuit, in contrast, the "bad faith" prong appears to be satisfied if the government is aware that the witness might be able to provide material evidence. See e.g., United States v. Leal-Del Carmen, 697 F.3d 964, 970 (9th Cir. 2012) ("[I]f the government interviews the witness or has other information suggesting that he could offer exculpatory evidence, the government may not deport him without first giving defense counsel a chance to interview him. The question of bad faith thus turns on what the government knew at the time it deported the witness.").

The only guidance from our Court of Appeals on how to apply the Valenzula-Bernal test appears to come from United States v. Moussaoui, 382 F.3d 453 (4th Cir. 2004). In Moussaoui, the Fourth Circuit considered a situation in which the district court ordered the United States to produce certain enemy combatant witnesses for the purpose of being deposed after the district court found that those witnesses might have evidence that was material to the defense. After considering the burden to the government from producing the witnesses and the

13

defendant's claimed Sixth Amendment right, the Court of Appeals analogized to other situations "falling into 'what might loosely be called the area of constitutionally guaranteed access to evidence.'" Id. at 474 (quoting Arizona v. Youngblood, 488 U.S. 51, 55 (1988)). Among other examples, the Court of Appeals specifically addressed Valenzuela-Bernal which it indicated stood for the proposition that there was no violation of either the Sixth Amendment or the Fifth Amendment if the United States deported a witness after concluding that the witness had no material evidence, but observed that "the Government's good faith deportation of the potential witnesses would be sanctionable if the witnesses were material to the defense." Moussaoui, 382 F.3d at 475. Although its reference to Valenzuela-Bernal is clearly dicta, the Court of Appeals went on to observe, broadly, that situations, such as this, which rely on the balancing of the government's interest in exercising a legitimate obligation (here, the obligation to deport illegal aliens) with the defendant's interest in access to a witness, the "balancing" test "is primarily, if not solely, an examination of whether . . . the information the Government seeks to withhold is material to the defense." Id. at 476. This view is generally consistent with the standard elucidated in the context of perseveration of physical evidence, in which the Supreme Court has held that "constitutional materiality"

14

requires that the evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." California v. Trombetta, 467 U.S. 479, 487 (1984).

Valenzuela-Bernal instructs, standing alone, that "the prompt deportation of illegal alien witnesses upon the Executive's good-faith determination that they possess no evidence favorable to the defendant in a criminal prosecution" is not "sufficient to establish a violation" of the Fifth or Sixth Amendments. 458 U.S. at 872. In order to make out a constitutional violation, there must be "some showing that the evidence lost would be both material and favorable to the defense." Id. at 873. Almost every circuit to have considered this instruction has concluded that creates a two-step test: "First, the defendant must show the government acted in bad faith. . . Second, the defendant must demonstrate that the deportation of the witness prejudiced his case." Leal-Del Carmen, 697 F.3d at 970. While the scope of the "bad faith" factor of the test is unsettled, the limited guidance provided by Moussaoui indicates, if nothing else, that the Fourth Circuit would not likely be inclined to adopt the requirement of a showing of "official animus or a conscious effort to suppress exculpatory evidence." United States v. Chaparro-Alcantara, 226

15

F.3d 616, 624 (7th Cir. 2000). Instead, "the presence or absence of bad faith . . . must necessarily turn on the [government's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." Arizona v. Youngblood, 488 U.S. 51, 57 n. * (1988). Indeed, Moussaoui suggests that, even absent a showing of bad faith, a defendant may be able to establish a violation simply on a showing of materiality. See 382 F.3d at 475 ("The Court nevertheless held that the Government's good faith deportation of the potential witnesses would be sanctionable if the witnesses were material to the defense.").

Whether the Fourth Circuit would recognize a bad faith requirement need not be prognosticated here. It is sufficient to conclude, as the Court does, that Valenzual-Bernal does not require an affirmative showing of animus on the behalf of the United States in its decision to deport a potential witness. Whether the test requires the defendant to demonstrate that the United States knew of the potential materiality of the witness's testimony, or whether the defendant need merely make a showing that the testimony may have been material, is of no immediate moment. The information upon which Bran relies in order to claim that Ticas would have provided material testimony was entirely in the possession of the United States. To the extent that it provides sufficient evidence to allow the Court to conclude that Ticas was a material witness, it necessarily requires the Court

to find that the United States should have known that fact as well.[4]

Valenzuela-Bernal does not require that the defendant demonstrate exactly what the deported witness would have testified to in order to establish that the witness would have been material. Indeed, the Court recognized that, "because prompt deportation deprives the defendant of an opportunity to interview the witnesses to determine precisely what favorable evidence they possess . . . the defendant cannot be expected to render a detailed description of their lost testimony."

---

[4] Here, the information was in the possession of the Department of Homeland Security which is a separate agency from the Department of Justice that was conducting the investigation into the murder of Osbin Hernandez-Gonzalez. There is no question that "in order to comply with Brady, . . . the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." Strickler v. Greene, 527 U.S. 263, 280 (1999). Indeed, despite issues of dual sovereignty, a federal prosecutor has a duty to learn of evidence held by state agencies that the prosecutor involved in the federal investigation. See United States v. Price, 566 F.3d 900 (9th Cir. 2009). Obviously, both the Department of Homeland Security and the Department of Justice are agencies of the same sovereign. Nevertheless, the Court need not determine whether Brady imputes the knowledge of exculpatory material held by all agencies of the federal government to the United States Attorney's Office. Here, Special Agent Rosenberg was in constant contact with the FBI agents and the Assistant United States Attorney assigned to the case. Rosenberg, who was actively participating in the investigation of MS-13 in the Richmond area, is properly considered an agent of the prosecutor in this case and, indeed, Rosenberg's knowledge is not imputed to the United States Attorney's Office; rather the prosecutor had actual knowledge of the facts relating to Ticas and his deportation.

17

Valenzuela-Bernal, 458 U.S. at 873. However, the Court noted, the defendant retained "the duty to make some showing of materiality." Id. The Court instructed,

> In some cases such a showing may be based upon agreed facts, and will be in the nature of a legal argument rather than a submission of additional facts. In other cases the criminal defendant may advance additional facts, either consistent with facts already known to the court or accompanied by a reasonable explanation for their inconsistency with such facts, with a view to persuading the court that the testimony of a deported witness would have been material and favorable to his defense.

Id. The Court also instructed that "sanctions will be warranted for deportation of alien witnesses only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." Id. at 873-74. However, in making this assessment, "courts should afford some leeway for the fact that the defendant necessarily proffers a description of the material evidence rather than the evidence itself." Id. at 874.

Complicating the analysis, somewhat, is the fact that the Court may not presume that the witness would decline to testify if he were called by the defense. The Fourth Circuit clearly has instructed "a court should not assume that a potential witness will invoke the Fifth Amendment." Moussaoui, 382 F.3d at 472; see also United States v. Walton, 602 F.2d 1176, 1179-80 (4th Cir. 1979) ("A witness is not the exclusive property of either

the government or a defendant; a defendant is entitled to have access to any prospective witness, although in the end the witness may refuse to be interviewed."); United States v. Scott, 518 F.2d 261, 268 (6th Cir. 1975) ("A defendant is entitled to have access to any prospective witness although such right of access may not lead to an actual interview."); United States v. Felice, 481 F. Supp. 79, 85 (N.D. Ohio 1978) ("Whether [the witness] will consent to giving such an interview, and the extent of any interview, are questions which are to be determined by [the witness] and his counsel . . . Any desire of [the witness] to decline such an interview should be conveyed directly to counsel for [the defendant], either by [the witness] or through his counsel and not via counsel for the government."). Even where, as here, the witness is likely to decline the interview, or decline to testify, "[t]he better procedure is to allow the defense counsel to hear directly from the witness whether he would be willing to talk to the defense." Walton, 602 F.2d at 1180. At the same time, however, the Court may consider "circumstances indicating that a potential witness will refuse to testify" in assessing the nature of the sanction. Moussaoui, 382 F.3d at 472 (citing United States v. Polowichak, 783 F.3d 410, 414 (4th Cir. 1986)); see also Watkins v. Callahan, 724 F.2d 1038, 1044 (1st Cir. 1984) ("[W]e believe that the trial court properly exercised its discretion in

19

declining to delay the trial for three months to await a witness who in all likelihood would refuse to testify.").

Thus, the question is whether Bran has made a sufficient showing that Ticas possessed information that would have been material to the defense in this case. The undisputed evidence, which was known to the United States before Ticas was deported, is that Ticas was the First Word of the Richmond Sailors Set following the deportation of the previous leader, "Spider." Ticas had been previously deported and was believed by the ICE to have returned to Richmond to retain command of the Sailors Set at the behest of the MS-13 leadership in El Salvador. The United States was also aware that Ticas had remained in communication with members of the Richmond Sailors Set while in ICE custody, including Bran and Giovanni Torres, who was known to be the Second Word of the Sailors Set as well as being Ticas' cousin. In addition, in September 2011, the United States received general information that Ticas had been responsible for a murder of a rival gang member in Chesterfield, Virginia. In April 2012, the United States received specific information from a named informant that Ticas had ordered the killing of Osbin Hernandez-Gonzalez, and, specifically, that Ticas had ordered Michael Arevalo to commit the murder. Phone records from the ICE detention facility indicated that Ticas made a number of phone calls immediately before and after the death of Hernandez-

Gonzalez. Agents with the FBI and ICE interviewed Ticas, who denied any involvement in MS-13; a claim that the agents did not believe. Notwithstanding this information, and the knowledge that defense counsel was attempting to contact Ticas, the United States deported Ticas to El Salvador rendering him unavailable to the defense.

On this record, the Court concludes that Bran has made an adequate showing that "the testimony of the deported witness[] would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." Valenzuela-Bernal, 458 U.S. at 873. The United States did not deport Ticas "upon the Executive's good-faith determination that [he] possess[ed] no evidence favorable to the defendant," id. at 872, rather the United State deported him even though it was aware that Ticas had been implicated in the murder of Osbin Hernandez-Gonzalez and that, at the very least, Ticas could, and almost certainly did, have information pertaining to the leadership structure of the Richmond Sailors Set of MS-13.[5]

---

[5] The United States notes that Bran would still be guilty of aiding and abetting the murder of Osbin Hernandez-Gonzalez even if Ticas had issued the order while incarcerated, if the evidence showed that Bran had passed that order along. See Govt. Resp. at 9. This is true. However, from the beginning, the United States' theory of the case was that Bran was the First Word of the Sailors Set and that he ordered the murder in that capacity. See Second Superseding Indictment (Docket No. 49) at ¶ 15(b) ("It was further a part of the conspiracy that the defendant Jose Armando Bran was the leader (a.k.a. "First Word")

21

As the Ninth Circuit has held:

> Once the government is aware that an alien
> has potentially exculpatory evidence, it
> must treat that person as a material witness
> and give defense counsel the opportunity to
> interview him and make a reasoned
> determination whether to seek his retention
> pending trial. This means the witness may
> not be deported before defense counsel has
> been retained or appointed and has had a
> fair opportunity to interview him. If
> defense counsel advises the government that
> the witness may be useful to the defense, he
> may not be deported until defense counsel
> indicates he is no longer needed. If the
> government wants to deport the witness
> notwithstanding defense counsel's wishes, it
> must obtain permission from the district
> court on a showing of good cause, which
> defense counsel must have the opportunity to
> oppose; it must also afford defense counsel
> the opportunity to cross-examine the witness
> and preserve the testimony for trial.

Leal-Del Carmen, 697 F.3d at 970. After all, "the government is uniquely empowered to deport witnesses and thus put them outside the reach of defense counsel and the district court. It may not use that power to give itself an unfair advantage." Id. at 971. As a result, the Court concludes that some sanction is appropriate.

---

of the MS-13 Sailors Set in and around Richmond, Virginia."). Evidence that Bran was not, in fact, the First Word of the Sailors Set would "substantially undermine this theory, although the Government might still be able to establish" criminal liability for whatever role Bran did play in the Sailors Set. Moussaoui, 382 F.3d at 473 n. 21 (noting that a witness may have material information if it undermined the government's theory of the case, even where they government might be able to advance an alternative theory of the case).

Bran asks the Court to dismiss the indictment or, in the alternative, to give the "missing witness" instruction, instructing the jury that they are permitted to infer that Ticas' testimony would not have been favorable to the United States. See Reply at 8. Dismissal of the indictment is a "harsh remedy." United States v. Goodson, 2041 F.3d 508, 514 (4th Cir. 2000); see also United States v. Derrick, 163 F.3d 799, 807 (4th Cir. 1998) ("The dismissal of an indictment altogether clearly thwarts the public's interest in the enforcement of its criminal laws in an even more profound and lasting way than the requirement of a retrial."). That remedy is clearly inappropriate where, as here, the evidence suggests that Ticas would not have, in fact, testified. The Court notes that Ticas lied to the federal agents regarding his continued membership in MS-13 and never responded to defense counsel's letter asking their investigator to be placed on the approved visitor list. It strains credulity to believe that, if Ticas had not been rendered unavailable to the defense, he would have willingly taken the stand in Bran's defense and implicated himself in a homicide. Further, although the scope of the government's information relating to Ticas did not become apparent to the defense until after Bran filed this motion, defense counsel knew that Ticas was being held by ICE pending deportation and knew, at least, that Ticas had been implicated in the murder by a

23

cooperating gang member. While the United States should not have deported a witness whom it knew to have material information without advising the defense, so too could the defense have sought a court order preventing his deportation until they were permitted to interview him. Further, courts that have found that the deportation of a material witness violated the defendant's rights have consistently concluded that the missing witness instruction is the appropriate sanction. See e.g., Leal-Del Carmen, 697 F.3d at 975 ("Where the government deports a witness who it knows would testify favorably for the defense, the defendant is entitled to have the jury informed."). It is settled that "the rule regarding missing witness instructions is that if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable." United States v. Lewis, 305 F. App'x 86, 88 (4th Cir. 2008) (quoting United States v. Brooks, 928 F.2d 1403, 1412 (4th Cir. 1991)). This creates a two-part test: (1) that the witness was "peculiarly within [the] power" of one of the parties and (2) that the witness is believed to have testimony that would "elucidate the transaction." See also United Sates v. Rios, 636 F.3d 168, 171 (5th Cir. 2011) ("A district court should not grant a missing witness instruction unless the individual (1) is peculiarly

24

within one party's power to produce, and (2) would provide testimony that will elucidate facts at issue."); United States v. Tavarez, 626 F.3d 902, 904-05 (7th Cir. 2010) ("Before the accused in a criminal case would be entitled to the instruction, he would need to show (1) that if called, the witness would have been able to provide relevant, noncumulative testimony on an issue in the case; and (2) that the witness was peculiarly in the other party's power to produce."); United States v. Perez, 299 F.3d 1, 3 (1st Cir. 2002) (a missing witness instruction is appropriate where "a criminal defendant [can] demonstrate that the uncalled witness is either 'favorably disposed' to testify on behalf of the government by virtue of status or relationship or 'peculiarly available' to the government" and where "the witness, if called, would be likely to provide relevant, non-cumulative testimony.").

Here, there is no question that Ticas was "peculiarly within the power" of the United States. Indeed, by deporting Ticas, the United States is directly responsible for his absence at the trial. Further, for the reasons set forth above, the Court concludes that Bran has made an adequate showing that Ticas possessed relevant non-cumulative evidence that would have served to "elucidate the transaction." Therefore, the Court finds that the "missing witness" instruction is appropriate.

## CONCLUSION

For the reasons set forth above, Jose Armando Bran's ("Bran") MOTION IN LIMINE TO DISMISS THE SECOND SUPERCEDING [sic] INDICTMENT (Docket No. 213 (sealed), 271 (redacted)) was granted in part and denied in part by the Court's Order dated May 8, 2013 (Docket No. 245). The Court declined to dismiss the indictment. The Court granted the motion to the extent that it sought the inclusion of the "missing witness" instruction.

It is so ORDERED.

/s/　　　　ʀᴇᴘ

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  June 11, 2013